Domenick **FALCONI**, Appellant,

v.

**FEDERAL DEPOSIT INSURANCE
CORPORATION.**

No. 12382.

United States Court of Appeals
Third Circuit.

Argued March 3, 1958.

Decided June 25, 1958.

Adolph L. Zeman, Canonsburg, Pa.
(Robert L. Zeman, Zeman & Zeman,
Canonsburg, Pa., on the brief), for appellant.

George R. Craig, Pittsburgh, Pa.
(Royal L. Coburn, General Counsel, John
L. Cecil, Asst. Gen. Counsel, Federal Deposit Insurance Corporation, Washington, D. C., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN
and KALODNER, Circuit Judges.

## 288

KALODNER, Circuit Judge.

Domenick Falconi ("plaintiff") brought suit against the Federal Deposit Insurance Corporation ("defendant"), successor in interest to the insolvent First National Bank of Cecil, Pennsylvania ("Cecil Bank") to recover $19,200 allegedly unlawfully appropriated from his account at the First National Bank of Canonsburg, Pennsylvania ("Canonsburg Bank") to the use of the Cecil Bank. The jury returned a verdict for the plaintiff in the amount of $21,000 and judgment was entered thereon. Subsequently the District Court granted defendant's motion for judgment n. o. v. and, alternatively, its motion for a new trial.[1] Plaintiff appealed.

The critical facts may be summarized as follows:

Plaintiff is a resident of Canonsburg, Washington County, Pennsylvania. At the time the events which are under consideration took place he was a farmer, beer distributor, livestock and real estate dealer. He maintained his principal personal and business checking accounts in the Cecil Bank. His wife, his daughter, his son, Phillip, his brother, Cesare and his nephew, Angelo, also had checking accounts in the Cecil Bank. Some of these accounts were in individual names; others were in joint names, but plaintiff controlled all of them. At the time the Cecil Bank closed there was some $70,000 on deposit in plaintiff's personal and business accounts and the accounts of his relatives. All of the $70,000 was the plaintiff's money, according to his testimony at the trial. Plaintiff was permitted, in the course of the crazy-quilt operation of the Cecil Bank, to treat the accounts of his relatives as those they were in his own name, drawing checks on them at will.

Plaintiff also maintained small checking accounts in the Citizens Trust Company of Canonsburg and the Canonsburg Bank.

The Cecil Bank was a one-man organization operated by the plaintiff's long-time close friend and financial advisor, John F. Wagner ("Wagner"), its executive vice-president and cashier.

Wagner committed suicide on September 25, 1950. Thereafter the directors of the Cecil Bank determined that the institution was insolvent, and called upon the defendant for aid. Pursuant thereto, defendant entered into an agreement with the insolvent Cecil Bank and the First National Bank of McDonald, Pennsylvania, in a nearby town, under which the McDonald Bank assumed all of the deposit liabilities of the Cecil Bank and the defendant provided the necessary funds to make it whole.

During the course of the liquidation of the Cecil Bank defendant discovered numerous irregularities traceable to Wagner's helter-skelter operations and manipulations. Particularly pertinent to the instant case were the checks and promissory notes signed in blank by plaintiff and others and the total absence of records of many deposits and other bank transactions.

Plaintiff's claim is based upon a transaction involving two checks drawn on his account at the Canonsburg Bank. These checks, plaintiff testified, were signed in blank and left with Wagner for use in furtherance of his business transactions; the dates, payees and amounts were to be filled in by the Cecil Bank in accordance with his express instructions; the checks, however, were filled in by Wagner and diverted to the bank's exclusive use without his knowledge or authority.

The two checks totalled $19,265.70. The first, in the sum of $9,265.70 was dated September 19, 1950, and made payable to the order of Joe Minehart. The second, in the amount of $10,000, was dated September 21, 1950, and made payable to the First National Bank of Cecil. Plaintiff asserts that, in exchange for these checks, Wagner, on September 19th, gave him three checks totalling $19,200, together with $65.70 in cash. The three checks were drawn on the Cecil Bank and made payable to plaintiff. The

1. The District Court's opinion is reported at D.C.W.D.Pa.1957, 153 F. 867.

first, in the amount of $1,800, was dated September 20, 1950, and signed John F. Wagner. The second, in the amount of $7,400, was dated September 21, 1950, and signed Steve Spataro. The third, in the amount of $10,000 was dated September 22, 1950, and signed John C. Joseph (as President) on the P. & J. Coal Mining Co. checking account.

Plaintiff had a balance of only $1,051.78 at the Canonsburg Bank when Wagner filled in the two checks totalling $19,265.70 drawn on that account.[2] The three checks given in return were designed to cover these checks and Wagner accordingly instructed plaintiff to deposit them at the Canonsburg Bank. Plaintiff duly deposited the checks as instructed—two on September 22d and the third on September 25th. The deposits enabled the Canonsburg Bank to honor the two checks drawn on plaintiff's account, but the three cover checks were subsequently dishonored when presented for payment at the Cecil Bank. As a result, plaintiff was required to reimburse the Canonsburg Bank in the amount of $19,200, the total of the three checks. It is this sum, plus interest, which plaintiff seeks to recover in this action.

By way of defense to plaintiff's claim, defendant asserts that the transaction in question was part and parcel of a check kiting operation and that recovery should be denied because of its illegality. Plaintiff concedes the existence of a series of check kite operations but argues that his claim is completely separate from and independent of the kite. With the issues so framed, the question presented is: Was the transaction between plaintiff and Wagner a mere continuation of an illegal check kite for plaintiff's benefit or were the checks drawn on plaintiff's account for the exclusive benefit of the Cecil Bank and therefore separate and independent of the illegal operation.

A check kite has been defined as a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two banks.[3] The kite in the instant case involved three different types of checks: (1) checks drawn on the Canonsburg Bank which the plaintiff had signed in blank and left with Wagner; (2) checks drawn on the Cecil Bank which plaintiff made payable to himself and signed some name other than his own as the purported drawer; and (3) checks drawn on the Cecil Bank which Wagner made payable to plaintiff and signed someone else's name as the purported drawer.

The audit conducted by defendant disclosed that plaintiff had signed numerous names to these checks, among them, Lentre Rosconi, A. L. Richere, P. D. Santissi, Pietre Guardieri, Pietro Rosconi and Rosconi Pietro. Among the names signed by Wagner were Steve Spataro and P. & J. Coal Mining Co. The kiting operation worked substantially as follows: Wagner would fill in one of the checks on the Canonsburg Bank signed in blank by plaintiff and would forward it through banking channels for payment. It would take several days for the check to clear and on or before the day it was scheduled to reach the Canonsburg Bank, plaintiff or Wagner would cover it by depositing in plaintiff's account one of the "manufactured" checks drawn on the Cecil Bank.[4] When that check reached the Cecil Bank Wagner would cover it by one of plaintiff's signed-in-blank checks drawn on the Canonsburg Bank. This check, in turn, would be covered by a "manufactured" check drawn on the Cecil Bank. The operation continued until the false credit so created

---

2. This balance was further reduced to $874.65 on September 21, 1950.

3. Fidelity and Casualty Co. of New York v. Bank of Altenburg, 8 Cir., 1954, 216 F.2d 294, 302-303, certiorari denied 1955, 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744.

4. The liquidator found that large deposits to plaintiff's account at the Canonsburg Bank from October 22, 1948 to September 25, 1950. which were promptly withdrawn totalled $1,233,857.02. The average per month during this period before Wagner's death was $53,645.95. For the five months following Wagner's death, net deposits were $31,807.08, with an average monthly deposit of $6,361.42.

was finally paid (or discovered). Plaintiff himself testified to these practices and admitted they were for his benefit. This was corroborated by the audit conducted by defendant which included photographs of Recordak film of numerous checks and ledger sheets.

The record discloses the following additional facts pertinent to our inquiry: the Cecil Bank received credit from the Federal Reserve Bank for the sum of $19,265.70, representing the two signed checks on the Canonsburg Bank filled in by Wagner; the names used on four of the checks (Steve Spataro, P. & J. Coal Mining Co., Joe Minehart and John F. Wagner) were identical with those used in admitted earlier kiting operations. Plaintiff himself testified that the only difference between the three "manufactured" checks purportedly drawn on the Cecil Bank by Spataro, Wagner and the P. & J. Coal Mining Co., given him by Wagner to deposit in the Canonsburg Bank, and those previously used to cover kited checks drawn on that bank, was the fact that the other checks were always paid, whereas the ones in question were not.

On review of the record we are of the opinion that the District Court did not err in setting aside the jury's verdict and entering judgment for the defendant. Plaintiff premised his case on two grounds: (1) that Wagner's unauthorized use of the two checks, signed in blank, and his acceptance of the three checks which Wagner gave him for deposit in the Canonsburg Bank was not a part of their 23-month old kiting operations and (2) his two checks were used for the benefit of the Cecil Bank.

Plaintiff's own testimony establishes that his claim is without merit.

With respect to his first contention he testified, and the documentary evidence adduced by defendant so established, that his bank balance at the Canonsburg Bank throughout its existence averaged between $1,000 and $2,000 and that on September 19, 1950, his balance at that bank was approximately $1,000. Further, plaintiff himself testified that on September 19, he learned from Wagner that the latter had filled in two blank checks on the Canonsburg Bank in a total amount of $19,265.70; that at the same time Wagner gave him $65.70 in cash and three checks on the Cecil Bank totalling $19,200—one in the amount of $1,800 dated September 20, 1950 signed by Wagner, another in the amount of $7,400 dated September 21, 1950, signed "Steve Spataro" and still another dated September 22, 1950, in the amount of $10,000 signed "John C. Joseph" (as president) drawn on the P. & J. Coal Mining Co. account. Neither Wagner, Spataro nor Joseph (or the P. & J. Coal Mining Co.), plaintiff testified, owed him any money at the time he was given the checks bearing their signatures as makers. Plaintiff advanced no explanation as to why he accepted checks in such substantial amounts when their drawers were admittedly not indebted to him at the time.[5]

Plaintiff testified that when Wagner gave him the three checks above referred to and advised him that they were to cover plaintiff's two checks on the Canonsburg Bank plaintiff said nothing and made no objection to Wagner's filling in of these two checks signed in blank. He

5. On direct examination plaintiff testified as follows (pp. 13–14 N.T.):
   "Q. Now then, at that time did the P. & J. Coal Mining Company, John C. Joseph owe you $10,000? A. No, no.
   "Q. Did you have any dealings with the P. & J. Coal Mining Company? A. No.
   "Q. Did Steve Spataro owe you or did you owe Steve Spataro— A. No.
   "Q. —or did Steve Spataro owe you $7,400? A. No, he no owe me anything.

   "Q. Did you have any dealings with him? A. No.
   "Q. Did John F. Wagner owe you $1,-800 at that time? A. No, he owe me on account the check he wrote on my account.
   "Q. I guess that's the proper answer. But I mean, he didn't pay you any— A. No, no.
   "Q. —anything that he owed you? A. No, no.
   "Q. With this check? A. No."

did not do so, he said, because "it was too late".[6] With respect to this statement the record shows that plaintiff's check which had been filled in to the order of Joe Minehart in the amount of $9,265.70 and dated September 19, 1950, was not deposited until September 20, 1950, a day after plaintiff's conversation with Wagner, and that plaintiff's check filled in to the order of the Cecil Bank in the amount of $10,000 and dated September 21, 1950, was deposited that day —two days after plaintiff's conversation with Wagner.

The foregoing facts clearly establish that plaintiff to his knowledge engaged in a kiting operation with Wagner. Whether the kiting operation, as plaintiff contends, enured to the Cecil Bank's benefit, or, as defendant contends, to plaintiff's benefit, is immaterial. Plaintiff knew that Wagner had filled in plaintiff's two checks in a total amount of $19,265.70 on the Canonsburg Bank account when there was only approximately $1,000 in that account; he knew that the three checks which Wagner gave him were designed to establish a credit to his account in the Canonsburg Bank sufficient to cover his own two checks on the Canonsburg Bank account. Plaintiff failed to make out a case and the jury's verdict in his favor cannot be sustained.

Check kiting is illegal and a criminal act under the laws of the United States when the mails are used, as they were in this case.[7] It is well-settled that where the plaintiff's conduct in connection with the transaction upon which his claim is based was illegal and criminal the courts will deny him relief.[8]

Further, here the record established a 23-month record of check kiting operations in which the plaintiff was an active participant and it is settled that a course of conduct once established is presumed to continue until the contrary is established;[9] otherwise stated, "Proof of the existence at a particular time of a fact of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time." [10]

For the reasons stated the judgment of the District Court for the defendant non obstante veredicto will be affirmed.

6. On direct examination plaintiff testified as follows (pp. 13–14 N.T.):

"Q. At the time he gave you these three checks, Exhibits 8, 9 and 10, did John instruct you as to how he wanted them to be deposited? A. He said to deposit two Friday and the other one Monday.

"Q. When John Wagner wrote these two checks without any authority from you and gave you these other checks did you object or what did you say to him? A. I said nothing.

"Q. Why didn't you? A. Well he wrote them. Even if I wanted to say anything it was too late.

"Q. And then did you deposit the two checks on Friday [Sept. 22, 1950]? A. Yes, sir.

"Q. And did you deposit the one check on Monday [Sept. 25, 1950]? A. On Monday."

7. 18 U.S.C. § 656, 62 Stat. 729; 18 U.S.C. § 1341, 62 Stat. 763, amended 63 Stat. 94. See also United States v. Matsinger, 3 Cir., 1951, 191 F.2d 1014; United States v. Feldman, 2 Cir., 1943, 136 F.2d 394, affirmed on other grounds, 1944, 322 U.S. 487, 64 S.Ct. 1082, 88 L.Ed. 1408; Federman v. United States, 7 Cir., 1929, 36 F.2d 441.

8. McMullen v. Hoffman, 1899, 174 U.S. 639, 654, 19 S.Ct. 839, 43 L.Ed. 1117; Continental Wall Paper Co. v. Lewis Voight & Sons Co., 1909, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486; Warner Bros. Theatres v. Cooper Foundation, 10 Cir., 1951, 189 F.2d 825; Restatement of Restitution, Chap. 8, Sec. 140. See also Dippel v. Brunozzi, 1950, 365 Pa. 264, 74 A.2d 112.

9. Feller v. McGrath, D.C.W.D.Pa.1952, 106 F.Supp. 147, 154, affirmed sub nom. Feller v. Brownell, 3 Cir., 1953, 201 F.2d 670, certiorari denied 346 U.S. 831, 74 S.Ct. 24, 98 L.Ed. 355.

10. 31 C.J.S. Evidence § 124 at pages 736–737, cited and applied in Noell v. United States, 9 Cir., 1950, 183 F.2d 334, 338, certiorari denied 1951, 340 U.S. 921, 71 S.Ct. 352, 95 L.Ed. 665. See also Penn Oil Co. v. Vacuum Oil Co., 1931, 60 App. D.C. 96, 48 F.2d 1008, 1011.