301 F.2d 149
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL JOINT EXECUTIVE BOARD OF HOTEL AND RESTAURANT
EMPLOYEES AND BARTENDERS INTERNATIONAL UNION OF
LONG BEACH AND ORANGE COUNTY and
Culinary Alliance Local 681,
Respondents.
 No. 17413.
 United States Court of Appeals Ninth Circuit.
 March 5, 1962.
 
 Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Elliott Moore and Daniel J. Harrington, Attorneys, National Labor Relations Board, Washington, D.C., for petitioner.
 Gyler & Gottlieb, Emanuel Gyler, Long Beach, Cal., for respondents.
 Before BARNES and JERTBERG, Circuit Judges, and DAVIS, District Judge.
 BARNES, Circuit Judge.
 
 
 1
 This is a petition by the National Labor Relations Board[1] for enforcement of its order[2] issued against respondents pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 59, 29 U.S.C.A. 151 et seq.) This court has jurisdiction by virtue of the unfair labor practices having occurred in Long Beach, California.
 
 
 2
 Because one of the grounds of appeal is alleged insufficient evidence, we state the evidence in some detail. In early 1959, Crown Cafeteria, a partnership,[3] was operating a cafeteria in Pasadena, California, and began remodeling a site for a second cafeteria in Long Beach, California. On about April 16, 1959, before Crown had begun hiring employees for its new Long Beach cafeteria, one Clayton Smith, Director of Organization for respondent, visited Crown's Long Beach site and left a copy of the Union's contract for one Leonard Smitley, Crown's managing partner. The contract contained a compulsory hiring clause, which required among other things that all employees of an employer who signed the contract must join the Union within thirty-one days of their employment.
 
 
 3
 On about May 2, 1959, organizer Smith returned to the Long Beach cafeteria and asked Smitley where he was obtaining employees; Smitley answered by stating that he was hiring locally. Organizer Smith then asked if Crown planned to operate a 'union house.' Smitley said 'no,' and added that he doubted, in view of Crown's wage scale and benefits, whether his employees would be interested in a union. Smitley also observed that it was up to the employees to elect whether they wanted a union; to which Smith said: 'That is not the way we do it nowadays.' Before leaving, organizer Smith asked Smitley if he had read the Union's contract yet; Smitley said he had not.
 
 
 4
 On May 4, 1959, the day before the Long Beach cafeteria was to open, organizer Smith returned and again asked Smitley if he had read the Union's contract. When Smitley answered that he had not, organizer Smith saw the cafeteria manager and suggested that if he 'had any influence with Mr. Smitley in regard to union activities' he should use it, or the Union would picket the cafeteria. The next morning, before the cafeteria opened for business, the Union had established a picket line with signs reading:
 
 
 5
 'Notice to all members of organized labor and their friends. This establishment is non-union. Please do not patronize.'
 
 
 6
 The Union admittedly did not represent a majority of Crown's employees on May 5, 1959, or on any subsequent material date.
 
 
 7
 The Board asserted jurisdiction over this case under its standards of retail business; i.e., that Crown's gross annual sales were in excess of $500,000. The Board found that Crown's business exceeded this standard and that the Long Beach cafeteria alone exceeded the standard when the business done in the first two months of its operations (May and June 1959) was projected on an annual basis.
 
 
 8
 The Board found that the Union, in attempting to have Crown sign a union-security contract when the Union did not represent a majority of the cafeteria's employees, violated Section 8(b)(2) of the Act.[4]
 
 
 9
 The Board's order requires respondents to cease attempting to cause Crown to enter into a union-security contract with them when they do not represent a majority of Crown's employees, and to post the customary notices.
 
 
 10
 The briefs of the parties herein present four questions to this court. These questions may be stated as follows:
 
 
 11
 1. Did the Board properly assert its jurisdiction over the alleged unfair labor practices?
 
 
 12
 2. Is these substantial evidence in the record to support the Board's finding that respondents violated Section 8(b)(2) by attempting to cause Crown to sign a union-security contract?
 
 
 13
 3. Should the Board have consolidated the instant case with a subsequent case against respondents?
 
 
 14
 4. Does the Supreme Court's rejection of the Curtis doctrine in N.L.R.B. v. Drivers, Chauffeurs, Helpers Local No. 639, 1960, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710, require a dismissal of the instant petition for enforcement?
 
 
 15
 * Jurisdiction
 
 
 16
 The trial examiner found the total sales of Crown's two cafeterias, during the period from July 1958 through June 1959, were in excess of $600,000; Pasadena accounting for $521,000 and Long Beach accounting for $90,000 in total sales during that period. The trial examiner also found that, during this period, both cafeterias purchased goods and equipment valued in excess of $100,000 which originated outside of California. It was further found that the record warranted a finding that both cafeterias were centrally controlled and that the figures of both could properly be considered in determining jurisdiction over the case; but, notwithstanding the propriety which such a finding would have, it was found that the projected figures of the Long Beach operation on an annual basis reveal that this operation alone meets the jurisdictional standard of the Board.
 
 
 17
 Respondents attack this finding on several theories. First, they claim that the two cafeterias are operated separately and therefore the figures from Crown's Pasadena operation cannot properly be used in determining the jurisdictional standard. From a businessman's point of view, this contention is without substantial merit. It is true separate books were kept for each cafeteria. This is common sense, and standard business procedure. How could a businessman properly analyze, conduct, evaluate, and control his business if he did not keep an accurate account on each branch of his enterprise? Recognizing the importance of following such an accounting system, does his make each branch, or cafeteria, a separate business? We hold it does not. If one location had a loss, it would offset a gain made at the other location. The profit of both would be added together to arrive at the total profit for the partnership's enterprise. Respondents offer no proof, in rebuttal to the findings, that each cafeteria was a separate partnership; i.e., no evidence is shown that each cafeteria was analogous to a separate corporation. Surely the trial examiner was correct in finding that the 'figures of both (cafeterias) may properly be considered' in determining the jurisdictional standard of the Board.
 
 
 18
 The Board asserted jurisdiction under its standard for a retail business. Hence respondents' contention that $50,000 of direct flow was also necessary to establish jurisdiction is based on the mistaken application of the Board's non-retail standard to Crown's retail business.
 
 
 19
 But even assuming respondent's erroneous contention to be valid, the trial examiner found that 'both operations purchased goods and equipment valued in excess of $100,000 which originated outside the State of California.' As stated above, we believe it was proper for the Board to consider the figures of both operations in determining its jurisdiction. Thus, respondents first urge that an erroneous standard was used for determining jurisdiction and, then, that it was erroneous for the Board to consider the figures from the operation of both locations; i.e., respondents first urge this court to only consider the direct flow figures of the Long Beach cafeteria, and, then, to apply the Board's non-retail standard to a retail business.
 
 
 20
 The contention here urged by respondents as to lack of jurisdiction is without merit. That the Board properly asserted its jurisdiction may be best answered by the following language in N.L.R.B. v. W. B. Jones Lumber Co., 9 Cir. 1957, 245 F.2d 388 at 390-391:
 
 
 21
 'If the first question be considered next, it will be found that the Board had jurisdiction by statute over any operations of a company which affect commerce within the meaning of the Act.
 
 
 22
 'There is no question of the power of the Board to act in the field. There is no question of the authority of the Board to resolve all controversy over coverage in a field where it had jurisdiction by statute.
 
 
 23
 'The Union contends that the Board should not assert in this case the jurisdiction which all agree it possesses. The Board should, so the Union contends, be bound by certain self-limiting standards gratuitously adopted by the Board itself. These standards, so announced, could not limit the jurisdiction conferred by Congress. The Board did not proclaim that, in all cases involving less monetary amounts than those contemplated by such regulations, the business in such amounts would never in a particular case have sufficient impact upon commerce to warrant the exercise of the powers of the Board. The purpose of these standards seems to have been to adopt a general rule of thumb so that the Board could concentrate its energies upon cause where the activities did have a substantial effect upon commerce as defined by the Act. It would not appear subversive if the Board had decided that the activities in extraordinary cases were such that there was a substantial effect upon commerce so defined, notwithstanding the traffic fell far below the standards in monetary value.
 
 
 24
 'Although this question had been discussed, it is not justiciable, in our opinion, unless either the activities fell outside the jurisdictional terminals set up by Congress or unjust discrimination were involved in the consideration of one case and refusal to hear others unfair or lacking in due process. If the rights and guaranties have been protected and the Board acts within the scope of its statutory authority, the question of whether or not it chooses to act within the established limits is one of policy. The courts are not vested with authority to control such exercise of prerogative. Furthermore, the Union has no right to challenge the exercise or non-exercise of any jurisdiction with which Congress has endowed the Board.'
 
 
 25
 That the operations of Crown affect commerce, within the meaning of the Act, seems unquestionable.
 
 II
 Sufficiency of Evidence
 
 26
 Respondents contend that in reviewing this matter this court should be guided by N.L.R.B. v. Local 50, Bakery & Confectionery Workers, 2 Cir. 1957, 245 F.2d 542. There the second circuit refused to enforce a Board order because there was no substantial evidence to sustain the Board's finding that the picketing was designed to induce a work stoppage or that it was for an unlawful objective. There the evidence showed that before certification the Union's picketing was aimed at propagandizing the employees and at gaining recognition from the employer; both objectives were then permitted by the statute. The second circuit there held unwarranted the Board's inference, in light of precertification evidence, that the Union's continued picketing was solely for the illegal purpose of coercing recognition. It was also held that the mere existence of a picket line was not to be interpreted as a strike signal. And, said the second circuit, lacking some evidence of inducement, the Board was not warranted in presuming that picketing was for an illegal purpose.
 
 
 27
 The case which respondents would have guide this court in this matter has been criticized.[5] But the second circuit has itself distinguished that holding in other cases which appear more closely in point on the facts to the instant case. In N.L.R.B. v. Knitgoods Worker's Union, Local 155, 1959, 267 F.2d 916, the second circuit held the Bakery & Confectionery Union case inapplicable. In the Knitgoods Worker's case, as in the instant case, no demands were made on the employees to join the union, but, as in the instant case, demands were made only on the employer; in the Bakery & Confectionery Union case the employees were solicited. In the Knitgoods Worker's case the picketing signs were characterized, as in the instant case, as organizational, but the second circuit agreed with the Board that little weight is to be given to such symbols. And in the Knitgoods Worker's case, as in the instant case (as distinguished from the Bakery & Confectionery Union case), the union did not make 'any efforts to reach the employees through any of the ordinary methods traditionally resorted to * * * to organize workers.'[6]
 
 
 28
 It is unquestioned that respondents did not represent a majority of Crown's employees. And a union's attempt to cause an employer to sign a contract containing a union-security provision, at a time when the union does not represent a majority of the employees of that employer, violates the proscription of Section 8(b)(2) of the Act. N.L.R.B. v. Local 208, International Bro. of Teamsters, et al., 9 Cir. 1961, 291 F.2d 374.
 
 
 29
 Respondents contend that: 'The instant case clearly reveals no demand was ever made by Respondents of the Company that it execute a contract. * * *'
 
 
 30
 We agree that the record does not reveal that respondents made an unequivocal verbal or written demand upon Crown to sign the union-security contract. The trial examiner, however, found that there was evidence supporting the conclusion that respondents' conduct was designed to achieve and force union recognition and a union-security contract. This finding was confirmed by the Board. That such evidence as is found in this record is substantial enough to support the findings of the Board was answered by us very recently in N.L.R.B. v. Local 208, International Bro. of Teamsters, et al.,supra, at 378, where the sequence of events and statements of the union's agent showed that the union sought to coerce an employer into executing a union-security contract. And, in our review, findings of the Board on questions of fact will not be disturbed if supported by substantial evidence. N.L.R.B. v. Cascade Employers Ass'n, Inc., 9 Cir. 1961, 296 F.2d 42.
 
 
 31
 Respondent also urge that the Board's finding on their objective (that a lack of a union-security contract was the unfairness attacked by the placards of the pickets) was erroneous. 'Objectives', say the respondents, 'can and do change and it is natural to assume that one intends to comply with the law when the law changes because an unlawful purpose is not likely to be inferred.'[7] But the unlawful objective found by the Board was, in our opinion, proven not to have changed.[8]
 
 
 32
 We hold there was substantial evidence, in all respects, to support the findings of the Board.
 
 III
 
 33
 Does N.L.R.B. v. Drivers, Chauffeurs, Helpers Local No. 639, supra, require dismissal?
 
 
 34
 Respondents contend International Association of Machinists, Local Lodge 311 v. N.L.R.B., 1961, 110 U.S. App.D.C. 74, 289 F.2d 451, completely supports their argument that the Supreme Court's decision in N.L.R.B. v. Drivers, Chauffeurs, Helpers Local No. 639, supra, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710, requires the Board's petition for enforcement in the instant case be dismissed. We disagree. The facts of the Bakery & Confectionery Union case, supra, and the Machinists Local case are close. This circuit's case, N.L.R.B. v. Local 208, International Bro. of Teamsters, et al., supra, is closer to the facts in the instant case; though respondents contend the latter case is 'entirely distinguishable from the facts of the instant case.'
 
 
 35
 The Board's complaint in the instant case originally alleged that respondents had violated Section 8(b)(1)(A) of the Act as well as Section 8(b)(2). The Board's decision in the instant case took cognizance of the Supreme Court's decision in the Drivers, Chauffeurs, Helpers Union case and held:
 
 
 36
 '3. Although the complaint alleged that respondent's picketing for a union-security clause violated Section 8(b)(1)(A) as well as Section 8(b)(2), the Supreme Court's decision makes it clear that peaceful picketing for any purpose does not restrain and coerce employees in violation of Section 8(b)(1) (A). Therefore, we shall dismiss the allegation in the complaint that Respondents' picketing for a union-security clause constituted a derivative violation of Section 8(b)(1)(A).'
 
 
 37
 In the Local 208 case, supra, the Board also found the Union to have violated Section 8(b)(1)(A), and its order provided a remedy accordingly. However, subsequent to the Supreme Court's Drivers, Chauffeurs, Helpers Union case, supra, the Board did not petition this court for enforcement of its order as were based upon its findings of a violation of Section 8(b)(1)(A). This court then enforced so much of the Board's order as was based on the union's violation of Section 8(b)(2) alone.
 
 IV
 Consolidation of Cases
 
 38
 Respondents here urge, as they before the Board, that the instant case should have been merged or consolidated with a second case filed on January 5, 1960, (almost two months after the hearing in the instant case) which alleged that respondents were violating Section 8(b)(7)(C) of the Act.[9] It is the contention of respondents that an analysis of the two complaints and notices of hearing reveal substantial similarity. The essence of this contention is:
 
 
 39
 'It is therefore submitted the Petitioner had the identical power to secure whatever relief they deemed essential under case, No. 1 (the instant case) without their issuance of a complaint in Case No. 2 since the facts of Case No. 2 were predicated to a substantial measure on the allegations contained in Case No. 1 with the exception that the Act of 1959 permitted a new charge to be filed under 8(b)(7)(C) and the effect thereof does not give authority to the Petitioner to overlook and bypass the pendency of another action when the principle of law is so well established that another action cannot be entertained when another action is pending involving the same parties and the same facts.'
 
 
 40
 The Board has, we think, adequately answered this same contention in a footnote to its decision and order which reads as follows:
 
 
 41
 '1. Respondent's argument that the complaint in this case should be dismissed on the ground that issuance of the complaint in case No. 21-CP-4 constituted a merger of this case and that case is without merit. The violation of Section 8(b)(2) found in this case is independent of the violation of Section 8(b)(7) (C) found in Local Joint Executive Board of Hotel and Restaurant Employees and Bartenders International Union of Long Beach and Orange County, et al. Crown Cafeteria, 130 N.L.R.B.No. 68.'
 
 
 42
 While the Board could have consolidated the cases[10] because of common facts and parties, we believe the Board correctly exercised its discretion in refusing to consolidate cases which were brought under different provisions of the Act. The instant case involves a violation of the 1947 Act; a relatively routine matter. On the other hand, the second case is one of first impression under the 1959 amendments to the Act. It was argued orally before the Board with other cases brought under the same amendments, and presently is before the Board on a motion for reconsideration.
 
 
 43
 A consolidation of cases before the Board rests in the Board's sound discretion. Lane v. N.L.R.B., 10 Cir. 1951, 186 F.2d 671, 675; N.L.R.B. v. Tex-O-Kan Flour Mills Co., 5 Cir. 1941, 122 F.2d 433, 437. Cf. F.C.C. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 142-143, 60 S.Ct. 437, 84 L.Ed. 656. We see niether an abuse of discretion nor a denial of due process in the Board's refusal to consolidate the two cases here under consideration and, therefore, believe this contention of respondents is without merit. Cf. United States v. Pan-American Petroleum Co., 9 Cir. 1932, 55 F.2d 753, cert. denied 287 U.S. 612, 53 S.Ct. 14, 77 L.Ed. 532.
 
 
 44
 A decree enforcing the Board's order in full is ordered entered.
 
 
 
 [1]
 Hereinafter for convenience referred to as the 'Board'
 
 
 [2]
 Reported at 130 NLRB No. 130
 
 
 [3]
 Hereinafter for convenience referred to as 'Crown'
 
 
 [4]
 'UNFAIR LABOR PRACTICES
 ,'Sec. 8. (b) It shall be an unfair labor paractice for a labor organization or its agents--
 '(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) * * *
 '(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees: * * *
 'Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services. Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b).'
 
 
 [5]
 See: Retail Wholesale & Dept. Store Union, AFL-CIO v. Rains, 5 Cir., 1959, 266 F.2d 503, 505-506
 
 
 [6]
 N.L.R.B. v. Knitgoods Workers' Union, Local 155, 267 F.2d at 919. See also, N.L.R.B. v. Local 239, International Bro. of Teamsters, et al., 2 Cir. 1961, 289 F.2d 41
 
 
 [7]
 Citing N.L.R.B. v. McGahey, 5 Cir. 1956, 233 F.2d 406
 
 
 [8]
 N.L.R.B. v. Local 239, International Bro. of Teamsters, et al., supra, at 43-44
 
 
 [9]
 This section, added by amendments enacted in September 1959, made picketing for recognition unlawful 'where such picketing has been conducted without a petition (for a Board election) having been filed within a reasonable period of time not to exceed 39 days.' This amendment became effective on November 13, 1959
 
 
 [10]
 In the Appendix to Respondents' Brief in the instant case are found the decision and order of the Board; the dissenting opinion; the intermediate report and recommended order; the motion and consideration; the General Counsel's motion for clarification of the Board's decision and order; the Board's charge filed against respondents; and the complaint and notice of hearing, in the second case